The **HANOVER INSURANCE COMPANY, Plaintiff,**

v.

**HERMOSA CONSTRUCTION GROUP, LLC; Hermosa Realty, LLC; Gregory A. Page; Tia L. Page; and Stephen Farrier, Defendants.**

Civil Action No. 1:13–CV–2933–ODE.

United States District Court, N.D. Georgia, Atlanta Division.

Signed May 1, 2014.

Seth Mills, Jr., Mills Paskert Divers P.A., Tampa, FL, Timothy Neal Toler, Mills Paskert Divers, Atlanta, GA, for Plaintiff.

Steve Farrier, Alpharetta, GA, pro se.

## ORDER

ORINDA D. EVANS, District Judge.

This action involving contract and tort claims is before the Court on Defendant Stephen F. Farrier's Motion to Dismiss [Doc. 10] and Plaintiff Hanover Insurance Company's Motion for Partial Summary Judgment [Doc. 26]. For the following reasons, Farrier's Motion to Dismiss [Doc. 10] is GRANTED IN PART AND DE-NIED IN PART and Hanover's Motion for Partial Summary Judgment [Doc. 26] is DENIED AS MOOT IN PART and GRANTED IN PART.

### I. Background [1]

Plaintiff Hanover Insurance Company ("Hanover" or "Plaintiff") is a commercial surety providing payment and perform-ance surety bonds to contractors on pub-lic and private construction projects [Plaintiff's Statement of Material Facts ("PSMF"), Doc. 26-2 ¶ 1]. Defendant Hermosa Construction Group, LLC ("Hermosa") provided construction ser-vices, materials, and labor on public and

---

1. The marshaling of facts in this case was complicated by Defendant Farrier's failure to file a response to Plaintiff's Statement of Material Facts, as clearly mandated by Local Rule 56.1. Defendant's "failure to comply with local rule 56.1 is not a mere technicali-ty." *Mann v. Taser Int'l, Inc.,* 588 F.3d 1291, 1303 (11th Cir.2009) (further explaining that "[t]he rule is designed to help the court iden-tify and organize the issues in the case.").

Moreover, Defendant's pro se status is not an acceptable excuse. *See Albra v. Advan, Inc.,* 490 F.3d 826, 829 (11th Cir.2007) (emphasiz-ing that pro se litigants must conform to procedural rules). However, given Farrier's apparent attempt to comply with the Rules by numbering a list of facts in his response brief [Doc. 28], the Court will take into account those facts which are supported by a citation to admissible evidence in the record.

private projects[2] [*Id.* ¶ 2]. Defendant Gregory Page was the Chief Executive Officer and President of Hermosa and defendant Hermosa Realty [*Id.* ¶ 14, 45].

Defendant Stephen Farrier ("Farrier" or "Defendant Farrier") was employed by Hermosa from November 6, 2012 to August 31, 2013 [*Id.* ¶ 9]. Farrier was the controller for Hermosa from November 6, 2012 to March 31, 2013, at which point he became the Chief Financial Officer ("CFO") and Chief Operations Officer ("COO"), positions he remained in until his departure in August 2013 [*Id.*]. Farrier was directly involved in the financial operations of Hermosa's business, including responsibility for financial planning, financial record-keeping, cash-flow management, accounts receivable and accounts payable, and financial reporting to Gregory Page [*Id.* ¶ 14]. Farrier had direct access to Hermosa's internal and project-related financial information and participated in determining how construction project funds would be applied and disbursed [*Id.* ¶¶ 12–13].

Between 2011 and 2013, Hanover issued payment and performance bonds on behalf of Hermosa on multiple public construction projects [*Id.* ¶ 4]. As a condition of those bonds, Gregory Page executed an Agreement of Indemnity (the "GAI") on behalf of Hermosa in favor of Hanover [*see* Pl. Ex. K, Doc. 26–13]. The GAI was signed on September 2, 2011 [*see id.*].

On or around January 31, 2013, Hermosa received a "Cure Notice" from the U.S. General Services Administration ("GSA"), as project owner on one of the Hanover

bonded projects (the "USAID project"), stating as follows:

> GSA has just become aware that Hermosa Construction Group has not been making prompt payments to their subcontractors. Such action reflects non-compliance to contractual requirements by Hermosa to make payment to their subcontractors within a period of 7 days after such amounts are paid to Hermosa by the Government. Thus, this non-compliance is found to be grounds for Termination of Default (T4D) per FAR Clause 52.249–8.[3]
>
> Therefore, under this CURE NOTICE, the Government seeks that Hermosa Construction Group cure this failure within 10 calendar days of receipt of this notice and forward to my attention your plan of action that Hermosa will take to cure this failure or GSA will start process toward T4D.

[PSMF ¶ 15; *see also* Pl. Ex. G, Doc. 26–9 (emphasis omitted) ].

At the time of the Cure Notice, Hermosa owed its subcontractors and suppliers approximately 2 million dollars on the USAID project, an amount which exceeded Hermosa's contract balance on the project by at least 1.5 million dollars [Farrier Dep., Pl. Ex. F, Doc. 26–8 at 124–26]. This meant that Hermosa was not in a position to pay its subcontractors solely from project funds [*see id.*].

As a consequence of its substantial shortfall on the USAID project, Hermosa requested Hanover's assistance in satisfying its outstanding debts [PSMF ¶ 18; *see also* Pl. Ex. H, Doc. 26–10]. On or about April 30, 2013,[4] Hermosa and Hanover en-

---

2. Hanover's Complaint represents that Hermosa was administratively dissolved on August 13, 2013 [Complaint, Doc. 1 ¶ 2]. That allegation has not been disputed.

3. *See* Federal Acquisition Regulations Systems ("FAR"), 48 C.F.R. § 52.249–8.

4. Farrier disputes this date. He cites to several emails dated May 3, 2013 to May 17, 2013 that indicate that the FDA was still being negotiated and finalized [*see* Def. Exs. I, J, K, Doc. 28–1]. The Court need not make a factual finding at this time because the effec-

tered into a Contract Funds Disbursement Agreement (the "FDA") [Pl. Ex. J, Doc. 26–12]. The FDA, which incorporated by reference the earlier GAI, provided that any and all funds due or to become due to Hermosa on construction projects bonded by Hanover would be deposited into a "Disbursement Account" and disbursed pursuant to the terms and conditions of the FDA, which required Hermosa to submit a written Vendor Payment Request and Certification for valid project costs, requesting and authorizing Hanover to make specific disbursements from the account to Hermosa's subcontractors or suppliers or' directly to Hermosa [*see id.* at 4]. Farrier and Gregory Page signed the FDA as Hermosa's designated agents [Farrier Dep., Doc. 26–8 at 151–53].

As a further condition of Hanover's financial assistance, Hermosa submitted "Letters of Direction" to each of the government entity owners on the Hanover bonded projects. In relevant part, each letter stated:

> [Hermosa] hereby acknowledges and ratifies its prior assignment of funds due under the above referenced contract and further **irrevocably** directs that any and all payment due, or to become due hereafter, of any kind or nature, on account of the above-described contract and Project shall be made payable to [Hanover].... These funds are trust funds, which will be utilized to ensure payment to the project's subcontractors, materialmen, and laborers.

[Pl. Ex. I, Doc. 26–11 (emphasis in original)]. Farrier signed the Letters of Direction on behalf of Hermosa [*see id.*], and stated in his deposition that the purpose of the letters was "[t]o direct contract funds [directly] to Hanover" [Farrier Dep., Pl. Ex. F, Doc. 26–8 at 149].

Though not entirely clear from the record, it appears that those signed Letters of Direction were sent by Hermosa to Hanover's consultant, Nicholson Consulting, to be sent out to the government entities on Hanover bonded projects. On May 29, 2013, Hermosa's counsel emailed Hanover's counsel to inform him of a "very serious problem," namely that Nicholson Consulting had issued Letters of Default along with the Letters of Direction to all of the project owners [*see* Def. Ex. L, Doc. 28–1 at 83]. Later that day, Hanover's counsel responded in relevant part:

> I am just learning of this situation. It appears that rather than send me (as Escrow Agent) the Voluntary Letters of Default and then send Nicholson the Letters of Direction as [Hanover] requested ... BOTH the Voluntary Letters of Default and the Letters of Direction were inadvertently sent to Nicholson Consulting. From what I currently understand, and that is not much, once received by Nicholson, their administrative staff simply forwarded both letters on to the [project owners].... First, you have both my and Hanover's sincerest apologies. We need to jointly issue a retraction to the Voluntary Letters of Default tomorrow morning and correct the situation....

[*Id.* at 81–82 (emphasis in original)]. It appears that the retraction letters were sent the following day [*see id.* at 80].

Between April 30, 2013 and August 24, 2013, Hermosa received a total of $961,505.18 in contract funds on Hanover bonded projects [PSMF ¶ 29]. Attached to Plaintiff's motion for partial summary

---

tive date of the FDA is not relevant to the disposition of the claims at issue in this Order.

judgment is a list of those payments broken down by project and date, and Farrier confirmed during his deposition that these payments were in fact received by Hermosa [*see* Pl. Ex. L, Doc. 26–14; Farrier Dep., Doc. 26–8 at 157]. Farrier also confirmed that most if not all of the money has never been turned over to Hanover [Farrier Dep., Doc. 26–8 at 157].[5]

When asked whether he agreed that Hermosa failed to follow the procedure set forth in the FDA, Farrier replied "yes" [*Id.* at 159]. Farrier further admitted that Hermosa used funds received on Hanover bonded projects for purposes other than paying Hermosa's subcontractors and suppliers on the projects, including Farrier's monthly salary, Gregory Page's monthly salary, office overhead, health insurance premium payments, and legal services [PSMF ¶¶ 32–37]. Farrier also asserts that some of the funds were used to pay "outstanding liabilities on the project[s]" [*Id.* at 155]. In other words, instead of sending the funds to the disbursing agent for disbursement to subcontractors and suppliers pursuant to the terms of the FDA, Hermosa would pay subcontractors and suppliers directly [*see id.*].

When asked whether he made decisions regarding the disbursement of contract funds, Farrier responded that he participated in the decision-making process and recommended that Hermosa not remit the funds to the disbursing agent pursuant to the terms of the FDA, but it was Gregory Page who had the authority to make the "final" decision [*Id.* at 155–56].

On June 27, 2013, Toby Pilcher, a Senior Claims Attorney for Hanover, sent an email to Farrier stating, "Hanover has not yet received any payments from the Hermosa bonded projected. . . . This will serve as Hanover's demand that Hermosa immediately turn over to Hanover any future payments that Hermosa may receive on any of Hanover's bonded projects" [PSMF ¶ 40]. Farrier acknowledges that he received and responded to the email but did not tell Pilcher that Hermosa had, in fact, received funds from at least two of the Hanover bonded projects [Farrier Dep., Pl. Ex. F, Doc. 26–8 at 167–68].

Farrier claims, however, that there was no need to inform Pilcher of the funds because he had already notified one of the Nicholson consultants, Jeanie McNulty[6], of the payments received [Farrier Aff., Doc. 28–1 at 3]. He had also provided McNulty with a copy of Hermosa's General Ledger, which would have reflected any payments received, during a visit to Hermosa's office on the week of June 25, 2013 [*Id.*]. Farrier asserts that McNulty informed him via a telephone conversation in late July or early August 2013 that Hanover would not reimburse Hermosa for costs already incurred on Hanover bonded projects, to which he responded that he considered that decision to be a "breach" of the FDA [*Id.* at 4]. Finally, Farrier claims that his only duty under the FDA was to sign and certify Vendor Request for Payment forms and that his signature alone-that is, without Gregory Page's signature-was insufficient to validate a request [Doc. 28 at 40].

5. Specifically, Farrier testified that the Morgan Brake project payment, in the amount of $15,831.95, "could have been" turned over to Hanover at some point. With that possible exception removed from the total amount, he was willing to confirm that no other payments had been turned over [*see* Farrier Dep., Doc. 26–8 at 157–58].

6. Hanover states that McNulty was a consultant for Hanover at all relevant times. Though not clear in the record, the Court assumes that McNulty oversaw the execution of the FDA and kept track of activity in the Disbursement Account.

Hanover's Complaint [Doc. 1], filed on September 3, 2013, sets forth the following counts: damages for breach of the Indemnity Agreement (Count I); specific performance of Indemnity Agreement and injunctive relief (Count II); damages for breach of Contract Funds Disbursement Agreement (Count III); specific performance of Contract Funds Disbursement Agreement and injunctive relief (Count IV); breach of fiduciary duty (Count V); fraudulent transfers (Count VI); statutory conversion (Count VII); common law conversion (Count VIII); and restitution for unjust enrichment (Count IX). Counts I through IV are asserted against Hermosa, Hermosa Realty, Gregory Page, and Tia Page (collectively, "the Indemnitors"); Counts V through IX are asserted against Hermosa, Gregory Page, and Farrier.

An automatic stay of these proceedings pursuant to 11 U.S.C. § 362 is in place against Defendants Gregory and Tia Page [Doc. 11]. Defendants Hermosa and Hermosa Realty have not answered or otherwise defended against Plaintiff's Complaint; on January 6, 2014, Plaintiff moved for entry of default [Doc. 19]. Default was entered as to both Hermosa and Hermosa Realty on January 9, 2014 [Doc. 22].

Farrier, proceeding pro se, filed a Motion to Dismiss [Doc. 10] on September 27, 2013. Among other things, Farrier argues that Counts V through IX are barred by the economic loss rule, the breach of fiduciary duty claim fails because no statutory or contractual duty was owed or breached, and Plaintiff's claim for restitution for unjust enrichment fails to state a claim upon which relief can be granted.

Following discovery, Hanover filed a Motion for Partial Summary Judgment [Doc. 26] requesting that this Court hold, as a matter of law, that (1) Farrier is personally liable to Hanover for breach of fiduciary duty and defalcation of trust funds; and (2) Farrier is personally liable to Hanover for common law and statutory conversion. Hanover contends that it is entitled to damages in an amount to be determined at trial.

## II. *Farrier's Motion to Dismiss* [Doc. 10]

■ Defendant Farrier has moved the Court to dismiss all of the claims asserted against him in the Complaint, including Counts V, VI, VII, VIII, and IX [*see* Doc. 1]. Farrier argues that all five claims are barred by the economic loss doctrine.[7] Hanover counters that its claims against Farrier "are founded upon legal duties that are owed by [Farrier] *independently* of any contract" [Doc. 12 at 7 (emphasis in original)].

■ The economic loss rule provides that a plaintiff may not recover in tort for purely economic damages arising from a breach of contract. *See Gen. Elec. Co. v. Lowe's Home Ctrs., Inc.,* 279 Ga. 77, 78, 608 S.E.2d 636 (Ga.2005). Rather, "a plaintiff can recover in tort only those economic losses resulting from injury to his person or damage to his property...." *Id.* Georgia courts have "generally looked at the nature of the damages suffered by a plaintiff in determining whether a suit may be brought in tort or only in contract," *Flintkote Co. v. Dravo Corp.,* 678 F.2d 942, 947 (11th Cir.1982), and have held in al-

---

7. Farrier also argues that the "business judgment rule" bars Hanover's claims. This argument is without merit. Georgia's business judgment rule provides that "[a]n officer is not liable *to the corporation or to its shareholders* for any action taken as an officer, or any failure to take any action, if he performed the duties of his office in compliance with this Code section." O.C.G.A. § 14–2–842(d) (emphasis added). This lawsuit was not brought by Hermosa or its shareholders; in other words, the business judgment rule is no defense to claims brought by a third party creditor (Hanover).

most all cases that "a contracting party who suffers purely economic losses must seek his remedy in contract and not in tort." *Gen. Elec. Co.*, 279 Ga. at 78, 608 S.E.2d 636; *see also Foxworthy, Inc. v. CMG Life Servs., Inc.*, No. 1:11–CV–2682–TWT, 2012 WL 1269127, at *2–5 (N.D.Ga. Apr. 16, 2012) (Thrash, J.) (dismissing breach of fiduciary duty and fraud claims where the alleged economic damages arose from breach of contract).

■ However, where "an independent duty exists under the law, the economic loss rule does not bar a tort claim because the claim is based on a recognized independent duty of care and thus does not fall within the scope of the rule." *Rosen v. Protective Life Ins. Co.*, No. 1:09–CV–3620, 2010 WL 2014657, at *9 (N.D.Ga. May 20, 2010) (Duffey, J.) (internal quotation marks and citation omitted). This principle has been applied in cases where the plaintiff identified a statutory or common law duty that would have existed absent the underlying contract. *See Liberty Mut. Fire Ins. Co. v. Cagle's, Inc.*, No. 1:10–CV–2158–TWT, 2010 WL 5288673, at *3 (N.D.Ga. Dec. 16, 2010) (Thrash, J.) (finding that while an insurance contract does not automatically create an independent duty of reasonableness and good faith on the part of the insurer, Georgia common law had imposed such an independent duty, thereby excepting a breach of fiduciary duty claim from the economic loss rule under those narrow circumstances); *Waldrip v. Voyles*, 201 Ga.App. 592, 594, 411 S.E.2d 765 (Ga.Ct.App.1991) (negligence claim not barred by economic loss rule where the "requirement that the creditor honor the debtor's allocation of payments on multiple obligations arises from O.C.G.A. § 13–4–42, not from a contract provision"); *E & M Constr. Co. v. Bob*, 115 Ga.App. 127, 128, 153 S.E.2d 641 (Ga.Ct. App.1967) (negligence claim not barred by economic loss rule where "[i]ndependently of any duty under a contract, the law imposes upon a contractor the duty not to negligently and wrongfully injure and damage the property of another.").

With these principles in mind, the Court examines each of the claims asserted against Farrier to ascertain which claims, if any, concern a duty that arose independently of the GAI and FDA agreements that form the basis of Hanover's breach of contract claim.

## A. Breach of Fiduciary Duty and Defalcation of Trust Funds (Count V)

■ Hanover acknowledges that its claim for breach of fiduciary duty and defalcation of trust funds (Count V) "encompass[es] a contract that defines the terms of the trust" [Doc. 12 at 8]. Indeed, the economic damages sought by Hanover arise entirely from Hermosa's purported failure to comply with its fiduciary duty under the terms of the FDA to hold as trust funds "all payments received for or on account of [Hanover] bonded contracts . . . in which [Hanover] has an interest, for the benefit of and for payment of all such obligations in connection with any such Contract or Contracts for which [Hanover] would be liable under any such bonds." [8] This was a purely contractual obligation. Because Hanover has not identified—and the Court is unable to discern—any private duty breached by Farrier which exists independently of the duties arising under the GAI and FDA, Hanover's breach of

---

**8.** Hanover's Complaint specifically identifies the alleged breach of fiduciary duty as the "fail[ure] to deposit project funds into the Disbursement Account" pursuant to the terms of the FDA [*see* Doc. 1 ¶¶ 101–02]. Hanover identifies no other fiduciary duty that has been violated.

fiduciary duty claim against Farrier is due to be dismissed.[9]

### B. *Fraudulent Transfer (Count VI)*

Hanover's Complaint [Doc. 1] makes clear that its fraudulent transfer cause of action is brought under Georgia's Uniform Fraudulent Transfers Act ("UFTA"). *See* O.C.G.A. § 18–2–74(a)(1) (providing that "[a] transfer made or obligation incurred by a debtor is fraudulent as to the creditor ... if the debtor made the transfer or incurred the obligation ... [w]ith actual intent to hinder, delay, or defraud any creditor of the debtor"). More specifically, Hanover asserts that the GAI and FDA gave rise to a debtor-creditor "claim" under O.C.G.A. § 18–2–1, which provides that "[w]henever one person, by contract or by law, is liable and bound to pay to another an amount of money, certain or uncertain, the relation of debtor and creditor exists between them." Thus, according to Hanover, Farrier's transfer of Hermosa's assets with the intent to hinder, delay, or defraud their creditors (including Hanover) rendered such transfers fraudulent pursuant to O.C.G.A. § 18–2–74.

■ Unlike the breach of fiduciary duty claim, the instant claim is separate and distinct from the GAI/FDA contracts. While it is true the debtor-creditor rela-tionship between Hermosa and Hanover would not have arisen but for the GAI/FDA contract, the very definition of a debtor-creditor relationship under O.C.G.A. § 18–2–1 expressly contemplates the existence of a contract. In other words, under the clear language of the UFTA, the Georgia legislature created a cause of action independent of any under-lying breach of contract claim. According-ly, Count VI may proceed against Farrier.

### C. *Conversion (Counts VII and VIII)*

Hanover also asserts claims for statuto-ry conversion (Count VII) and common law conversion (Count VIII). The factual predicate for these claims is identical. The fact that one arises from statute and one from common law is not significant; the common and dispositive question in deciding the instant motion is whether Hanover's conversion claims are separate and distinct from its breach of contract claim.

■ The Court answers that question in the affirmative, primarily because Hanover alleges conduct that was not merely a fail-ure to perform under the contract, but rather a willful and wrongful conversion of Hanover's property for personal use.[10] Courts have repeatedly recognized that in-tentional misconduct in the course of a

---

**9.** Hanover argues that Farrier can provide no authority holding the economic loss rule ap-plicable to a breach fiduciary duty claim. While it is true that Farrier neglected to cite authority, the same is true of Hanover and, indeed, it appears that there is no controlling case law on point. However, a finding by this Court that a breach of duty claim is barred by the economic loss rule is not unprecedented. *See Foxworthy, Inc.*, 2012 WL 1269127, at *2–5. Moreover, the Eleventh Circuit has ob-served—albeit in separate and unpublished opinions—that (1) Georgia's economic loss rule is similar to Florida's economic loss rule, *Luigino's Int'l, Inc. v. Miller*, 311 Fed.Appx. 289, 292–93 (11th Cir.2009), and (2) breach

of fiduciary duty claims can be barred by Florida's economic loss rule. *See Royal Sur-plus Ins. Co. v. Coachman Indus., Inc.*, 184 Fed.Appx. 894, 902 (11th Cir.2006). Thus, it stands to reason that a breach of fiduciary duty claim is not a per se exception to the economic loss rule under Georgia law.

**10.** Specifically, the Complaint states that Far-rier "act[ed] knowingly, willfully, and wan-tonly in ... obtain[ing], divert[ing] and ma[king] use of project funds, paid by the owners/obligees on multiple Hanover-bonded projects, for their own personal financial gain and benefit" [Doc. 1 ¶¶ 117, 124].

contractual relationship can give rise to a separate cause of action under tort law. *See, e.g., Holloman v. D.R. Horton, Inc.,* 241 Ga.App. 141, 148, 524 S.E.2d 790 (Ga. Ct.App.1999) ("The economic loss rule is inapplicable in the presence of passive concealment or fraud."); *Manhattan Const. Co. v. McArthur Elec., Inc.,* No. 1:06–CV–1512–WSD, 2007 WL 295535, at *11–12 (N.D.Ga. Jan. 30, 2007) (Duffey, J.) (denying a motion to dismiss a conversion claim under the "misrepresentation exception" to Georgia's economic loss rule where the complaint alleged that defendant "willfully and wrongfully violated [plaintiff's] statutory rights"); *see also Rakip v. Paradise Awnings Corp.,* 514 Fed.Appx. 917, 921 (11th Cir.2013) (finding that Florida courts have consistently held that the Florida economic loss rule does not bar a claim for civil theft or conversion). Accordingly, Hanover's claims against Farrier for statutory and common law conversion may proceed.

### D. *Unjust Enrichment (Count IX)*

Hanover's fifth and final claim against Farrier is premised on the same allegation as the conversion claims, namely that Farrier "received and made use of project funds paid by owners on Hanover bonded projects for [his] own personal gain and benefit" [Doc. 1 ¶ 137]. In response to Farrier's assertion that the claim is barred by the economic loss rule, Hanover points out that "restitution for unjust enrichment is founded in the law of equity, a duty imposed wholly independent of contract" [Doc. 12 at 8].

While the question of whether Georgia's economic loss rule bars claims that sound in equity or quasi-contract is an interesting question, it need not be addressed here because Georgia law is clear that "[a claim for] unjust enrichment is available only when there is no legal con-

tract." *Am. Casual Dining, L.P. v. Moe's Sw. Grill, LLC,* 426 F.Supp.2d 1356, 1372 (N.D.Ga.2006) (Thrash, J.) (citing *Camp Creek Hospitality Inns, Inc. v. Sheraton Franchise Corp.,* 139 F.3d 1396, 1413 (11th Cir.1998)). Hanover has failed to allege that an adequate remedy at law does not exist in this case and the Court can find nothing in the Complaint or in the arguments of the parties that would suggest the availability or necessity of equitable relief. Therefore, Hanover's claim for unjust enrichment is due to be dismissed.

### III. *Hanover's Motion for Partial Summary Judgment* [Doc. 26]

The Court will grant summary judgment to a movant when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a).

> [A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact.

*Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) (internal quotations omitted). To be material, a fact must be identified by the controlling substantive law as an essential element of the nonmoving party's case. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

In reviewing the record, the Court must make all reasonable inferences in favor of the nonmoving party. *Id.* at 255, 106 S.Ct. 2505; *Reese v. Herbert,* 527 F.3d 1253, 1271 (11th Cir.2008). However, "the mere existence of *some* alleged factual dispute

between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson,* 477 U.S. at 247–48, 106 S.Ct. 2505 (emphasis in original). Thus, there is no issue for trial unless there is "sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Id.* at 249, 106 S.Ct. 2505. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted. *Id.* at 249–50, 106 S.Ct. 2505.

Hanover seeks summary judgment against Defendant Farrier on three of the five counts originally asserted against Farrier, namely breach of fiduciary duty and defalcation of trust funds (Count V); statutory conversion (Count VII); and common law conversion (Count VIII). Having already determined above that Hanover has failed to state a claim for breach of fiduciary duty, the Court finds that the instant motion for partial summary judgment is moot as to Count V. The only remaining claims at issue, therefore, are the conversion claims.

■ Under Georgia law, "conversion consists of an unauthorized assumption and exercise of the right of ownership over personal property belonging to another, in hostility to his rights; an act of dominion over the personal property of another inconsistent with his rights; or an unauthorized appropriation." *DCA Architects, Inc. v. Am. Bldg. Consultants, Inc.,* 203 Ga.App. 598, 600, 417 S.E.2d 386 (Ga.Ct. App.1992) (internal quotation marks and citation omitted). In other words, to state a claim for conversion, " 'the complaining party must show (1) title to the property or the right of possession,[11] (2) actual possession in the other party, (3) demand for return of the property, and (4) refusal by the other party to return the property.' " *Internal Med. Alliance, LLC v. Budell,* 290 Ga.App. 231, 239, 659 S.E.2d 668 (Ga. Ct.App.2008) (quoting *Metzger v. Americredit Fin. Servs., Inc.,* 273 Ga.App. 453, 454, 615 S.E.2d 120 (Ga.Ct.App.2005)),[12]

■ Hanover's claim to a right of possession in the subject funds hinges on whether the GAI and FDA did in fact create a trust relationship in which the trustee (allegedly Hermosa and, by extension, Farrier) had a duty to hold contract funds (the alleged trust res) for the benefit of Hanover.[13] Article 7 of the GAI provided:

11. "[A] plaintiff in a conversion action need not show he is absolute owner of the converted property; he only need show a right of action or possession in the property." *Privitera v. Addison,* 190 Ga.App. 102, 106, 378 S.E.2d 312 (Ga.Ct.App.1989); *Gilbert v. Rafael,* 181 Ga.App. 460, 461, 352 S.E.2d 641 (Ga.Ct.App.1987). " 'Right of possession' means either actual possession or the right to immediate possession of the property." *Gilbert,* 181 Ga.App. at 461, 352 S.E.2d 641. But the "[r]ight to immediate possession ... must be absolute, unconditional, and exist at the time the action is commenced." *· Id.*

12. Common law conversion is codified at O.C.G.A. § 51–10–1, which provides that "[t]he owner of personalty is entitled to its

possession. Any deprivation of such possession is a tort for which an action lies."

13. It should be noted that Georgia courts have repeatedly recognized that monies held in trust can form the basis of a conversion claim. *See, e.g., Ga. Lottery Corp. v. First Nat'l Bank of Grady Cnty.,* 253 Ga.App. 784, 560 S.E.2d 345 (Ga.Ct.App.2002) (statute provided that lottery funds were earmarked in special trust so that when the Lottery was prevented from accessing such funds, a claim for conversion was applicable); *Adler v. Hertling,* 215 Ga.App. 769, 451 S.E.2d 91 (Ga.Ct. App.1994) (involving improper distributions from a trust account used for investment purposes); *Grant v. Newsome,* 201 Ga.App. 710, 411 S.E.2d 796 (Ga.Ct.App.1991) (allowing

The [Hermosa] Indemnitors covenant and agree that all funds due or to become due under any contract secured by a bond, whether in the possession of any [Hermosa] Indemnitor or others, are held in trust for the benefit and payment of all obligations incurred in the completion of said contract for which [Hanover] would be obligated under the bond. The trust shall inure for the benefit of [Hanover] for any liability or loss under any bond, and this Agreement shall constitute notice of such trust.

[Pl. Ex. K, Doc. 26–13 at 3]. Plaintiff is correct that similar language has been found sufficient to create a "trust" in the contract funds received by a contractor/indemnitor on bonded projects.[14]

Moreover, the GAI is incorporated by reference in the FDA, a document that Farrier executed in his capacity as Hermosa's COO and CFO on or around April 30, 2013. In relevant part, the FDA recites the following:

C) ... Surety bonds were issued by [Hanover] and, as a condition of issuing such bonds, Tia L. Page[,] Gregory A. Page and Hermosa Realty, LLC (hereinafter collectively the "Indemnitors") executed a certain [GAI] dated September 2, 2011, a copy of which is attached hereto and incorporated herein ...

D) Pursuant to such GAI, [Hanover] was granted certain assignment and takeover rights, and [Hermosa] Indemnitors agreed, among other things, that all payments received for or on account of [Hanover] bonded contracts (hereinafter collectively the "Contracts") shall be held as trust funds in which [Hanover] has an interest, for the benefit of and for payment of all such obligations in connection with any such Contract or Contracts for which [Hanover] would be liable under any such bonds; and

E) [Hermosa] notified [Hanover] that it is experiencing cash flow problems and requested financial assistance from [Hanover] to pay outstanding amounts owed to subcontractors and suppliers which remain open and pending as of the date of this Agreement because [Hermosa] has been unable to timely pay for certain labor and materials used in the prosecution of the Contracts; and

G) That this Agreement is intended to reaffirm and supplement the terms and obligations of the GAI, and document in more detail the procedure by which [Hermosa] and [Hanover] intend to assure that those terms, conditions, rights and obligations under the GAI are adhered to and protected.

[Pl. Ex. J, Doc. 26–12 at 2].

The FDA further provides:

[Hermosa] agrees and acknowledges that this [FDA] is separate and distinct from the GAI, and is not intended to alter, change or replace the GAI. Such GAI shall remain in full force and effect as of the date of its execution.... The execution of this FDA shall not release, waive, or replace any of the [Hermosa] Indemnitors' and [Hanover's] rights and obligations pursuant to the GAI.... [Hermosa] hereby ratifies the GAI and

---

claim for conversion regarding funds removed from an account held by a prison on behalf of a prisoner).

**14.** *See, e.g., Developers Sur. & Indem. Co. v. Bi–Tech Const., Inc.,* 979 F.Supp.2d 1307, 1311–12, 1317–18 (S.D.Fla.2013); *In re Hastings,* 438 B.R. 743 (Bankr.N.D.Ala.2008) (debt not dischargeable in bankruptcy due to violation of trust fund provision); *In re Frederick,* No. 09–70063, 2012 WL 465857 (Bankr.N.D.Ala.2012) (same).

acknowledges all of its rights and responsibilities thereunder.

[*Id.* at 3]. It is clear to the Court that the FDA, signed by Farrier as CFO/COO and designated agent of Hermosa [*id.* at 7], meets the Georgia statutory requirements for the creation of an express trust [15] in favor of Hanover. Thus, Hanover has conclusively established the first element of conversion, namely that it had a "right of action or possession" in the project funds. *See Privitera,* 190 Ga.App. at 106, 378 S.E.2d 312.

Further, Hanover has no difficulty establishing the remaining elements of conversion, as it is undisputed that Hermosa was in possession of the subject funds at a time when Hanover had the right of possession, Hanover demanded that those funds be turned over, and Hermosa refused to do so.

■ Because a corporate officer who participates in the conversion of property is individually liable even if he does not personally profit from the conversion, *DCA Architects,* 203 Ga.App. at 600, 417 S.E.2d 386, Farrier's diversion of trust funds that were to be held for the benefit of Hanover is an act of conversion for which he can be held liable. Thus, the Court finds that summary judgment is due to be granted against Defendant Farrier on Hanover's claims of statutory and common law conversion (Counts VII and VIII).

## IV. *Conclusion*

Defendant Farrier's Motion to Dismiss [Doc. 10] is GRANTED as to Counts V and IX and DENIED as to Counts VI, VII and VIII. In addition, Hanover's Motion for Partial Summary Judgment [Doc. 26] is DISMISSED AS MOOT as to Count V and GRANTED as to Counts VII and VIII.

---

15. *See* O.C.G.A. § 53–12–20(b) ("An express trust shall have, ascertainable with reasonable certainty: (1) An intention by a settlor to create such trust; (2) Trust property; (3) ... a beneficiary who is reasonably ascertainable ...; (4) A trustee; and (5) Trustee duties specified in writing or provided by law."). Here, the intent to create a trust is made clear by both the incorporation of the GAI and language stating that "all payments received for or on account of [Hanover] bonded contracts ... shall be held as trust funds in which [Hanover] has an interest, for the benefit of and for payment of all such obligations in connection with any such Contract or Contracts for which [Hanover] would be liable under any such bonds" [Pl. Ex. J, Doc. 26–12 at 2]. The trustee was Hermosa and trustee duties included the duty to deposit all received contract funds into the Disbursement Account for disbursement pursuant to the terms and conditions of the FDA.